# The Third District Court of Appeal

## State of Florida

Opinion filed July 22, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D24-1040 & 3D24-1368
Lower Tribunal No. F20-10308
_____

**Evin A. Figueroa Hernandez,**
Appellant,

vs.

**State of Florida,**
Appellee.

Appeals from the Circuit Court for Miami-Dade County, Marisa Tinkler Mendez and William Altfield, Judges.

Michael Van Cleve, Law, and Michael Van Cleve, for appellant.

James Uthmeier, Attorney General, and Sandra Lipman, Senior Assistant Attorney General and Yolande M. Samerson, Assistant Attorney General, for appellee.

Before SCALES, C.J., and FERNANDEZ and LOGUE, JJ.

SCALES, C.J.

Appellant Evan A. Figueroa Hernandez appeals both his convictions on six counts of criminal sexual activity with a minor (case number 3D24-1040) and the trial court's denial of his Florida Rule of Criminal Procedure 3.850 motion based on the ground of double jeopardy (case number 3D24-1368). We consolidated the two appeals. We affirm Appellant's convictions and affirm the trial court's denial of Appellant's postconviction motion.

**I. Relevant Background**

*A. Charges, Convictions and Sentence*

The State charged Appellant with one count of violating section 794.011(8)(b) of the Florida Statutes, sexual activity with a child by a person in familial or custodial authority, and five counts of violating sections 800.04(5)(c) and 800.04(6)(b) of the Florida Statutes, respectively, prohibiting lewd and lascivious molestation of a child and lewd and lascivious conduct. On May 14, 2024, after a six-day trial, the jury convicted Appellant on all counts. On count 1, Appellant was sentenced to twenty-five years in prison followed by twenty years of probation; on counts 2-6, he was sentenced to fifteen years in prison followed by twenty years of probation – all sentences to run concurrently. The trial court also entered an order finding Appellant a sexual predator.

*B. The Criminal Episode and Aftermath, Medical Exam and Report*

At the time of the alleged crimes, Victim was twelve-years old. She is the daughter of a divorced woman who was dating Appellant. On the evening of July 16, 2020, Appellant was in Victim's bedroom where Victim was teaching him English. Victim's mother was in her own bedroom watching television. After locking the door, Appellant lay on the bed beside Victim, pulled down her underwear, rubbed his penis against her vagina and buttocks, and kissed her breasts and mouth. At a certain point, he stopped, dressed, and left the bedroom. Victim immediately told her mother what happened. Appellant denied everything and departed the apartment.

After her mother called 911, the police arrived and interviewed Victim. Twelve hours later, Cara Saxton, a nurse practitioner with the University of Miami Child Protection Team ("CPT"), examined Victim and, on the same day, CPT coordinator Armenta Acevedo interviewed her. Victim's statements to her mother, the investigating police officer, Saxton, Acevedo, as well as her trial testimony, were consistent.

In addition to conducting a medical exam of Victim, Saxton, the nurse practitioner, took swabs to distinguish Victim's DNA from that of another person. Saxton prepared a written report, which included a description of the sexual assault as presented by Victim. Prior to trial, Saxton ended her CPT employment and moved away from Miami. At trial, Dr. Walter Lambert, the

chief medical officer of CPT and Saxton's supervisor, explained the work of CPT and summarized Saxton's report for the jury. Dr. Lambert had not met with Victim.

Dr. Lambert explained that Saxton had asked Victim to point to the places where Victim had received sexual contact. Saxton then took two forensic swabs from each of these areas, sixteen in all. Dr. Lambert testified that the swabs were then labeled, sealed and stored until retrieved by law enforcement. He further testified that Victim's medical exam was normal and that the sexual contact Victim experienced did not and would not necessarily cause physical injury.

*C. The DNA Testing*

Cosette Alvarez of the Miami-Dade Police Department's crime lab tested the DNA swabs. She described the standard five-part process of her DNA analysis: extraction, quantification, preliminary chain reaction, analysis, and interpretation. From the serology test – called the "saliva presumptive test" – she detected sufficient biological material from which a sample was extracted for DNA testing. She determined a mixture of DNA consisting of two contributors, one male and one female. At both the Daubert[1] hearing and

---

[1] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); see § 90.702, Fla. Stat. (2023). "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." State Farm

4

at trial, she testified to the crime lab's accredited testing procedures. Applying the procedures of the crime lab's Technical Manual, she used the DNA subtraction method: the sample's major donor (Victim) is subtracted to reveal the foreign donor to determine a ratio of the two donors (a third donor was not found). The resulting foreign profile matched Appellant's DNA in all sample locations. She testified that her work underwent a technical peer review that found no error.

Defense DNA expert Tiffany Roy disputed the reliability of the State's testing procedures. Roy testified that Miami-Dade's crime lab should have updated to a new genotyping software (for example, STRmix), which is better suited for mixed profiles and profiles with low-grade DNA, both of which occurred here. Roy testified that the crime lab's manual method relies too much on the analyst's view of the DNA, yielding uncertainty in the tested locations. With low-grade DNA, the manual method may be inadequate to determine "stochastic" effects (random distortions) in the DNA sample. Roy testified that Alvarez, contrary to her own lab's standards, interpreted DNA

Mut. Auto. Ins. Co. v. All X-Ray Diagnostic Servs., Corp., 338 So. 3d 376, 383 (Fla. 3d DCA 2022) (quoting Kemp v. State, 280 So. 3d 81, 89 (Fla. 4th DCA 2019)). On April 4, 2023, the trial court conducted a Daubert hearing to address two defense motions in limine: (i) to suppress the State's forensic DNA report; and (ii) to prevent the State from referring to its serology test as a "saliva presumptive test." The trial court's May 26, 2023 Daubert order denied both motions.

5

profiles below a 60% peak-height ratio, this ratio constituting a threshold for scientific certainty. Below-level peaks have an increased potential for stochastic effects, any of which could lead to the unreliability of the result.[2]

*D. Procedural Rulings*

In case number 3D24-1040, Appellant challenges eleven procedural rulings of the trial court (the "Procedural Rulings").

1. Appellant moved for a continuance of the trial after the State added count 6 four days before the start of the trial. The State determined that Appellant had initiated sexual contact, i.e., kissing Victim on the mouth,

---

[2] Peak-height ratio is a measurement comparing the heights of two alleles at a specific locus. The relative peak height of alleles is an indicator of the presence of a DNA sample mixture of two or more contributors. An allele is a variation of a gene that one inherits from each biological parent. For example, as Roy explained in her testimony, there is a gene for eye color, and the allele determines the color itself. In DNA profiling, alleles are displayed as peaks on a chart. When the sample comes from only one person, two peaks of similar height will appear at a locus. "The process becomes more complicated where the DNA in the sample is a mixture from two or more individuals. In that case, more than two peaks may appear at any given locus and an individual profile may be determined only if the analyst is able to distinguish between donors, including by isolating a so-called 'major donor.'" United States v. Barton, 909 F.3d 1323, 1329 (11th Cir. 2018). Alvarez, the State's analyst, testified that she was aware that some samples were below the 60% peak-height threshold. A peak-height below 60% indicates either the presence of more than one DNA contributor or that the DNA is degraded in some way. Alvarez testified she proceeded cautiously and consistent with her laboratory's standard operating procedures in evaluating the samples. She determined that the samples below the 60% peak-height threshold were caused by there being a predominant component of DNA (Victim) in a mixture of two contributors.

6

during the two-week period prior to July 16, 2024 date of the alleged molestation of Victim in her bedroom. Appellant maintained he had been prejudiced by the late amendment. The State maintained that he was on notice all along from separate statements Victim had made in interviews of her. The trial court denied the continuance motion.

2. The police set up a controlled call between Victim's mother and Appellant that, eventually, led to his arrest. Appellant moved for a continuance because the State delayed in giving him a translated transcript of the call. The State maintained that it gave Appellant a transcript of the call more than three years prior to trial. The trial court denied the continuance motion.

3. Appellant sought text messages between Victim and her mother in the aftermath of the crime to ascertain whether the mother pressured Victim into making her accusation. In her deposition, the mother had denied any such text messages existed. The trial court ordered the State to examine Victim and the mother under oath, and the State reported back confirmation that the text messages did not exist. The trial court denied the defense motion; nonetheless, Appellant's counsel was able to cross-examine Victim and her mother on this issue during trial.

4. Appellant argues that the trial court improperly limited the testimony of defense witness Dean Tong. The trial court did not allow him to provide the jury with alternate hypotheses (e.g., witness coercion, memory contamination, other psychological phenomena), limiting his testimony to his area of expertise in child interviewing techniques and excluding testimony about whether Victim was telling the truth.

5. Appellant also argues, with respect to Tong's testimony, that the trial court erred by finding the CPT handbook hearsay. Nevertheless, Tong did testify as to whether Acevedo deviated from the CPT handbook in her interview. The trial court later allowed defense counsel to raise the CPT handbook in another line of questions.

6. Appellant argues that the trial court allowed an improper impeachment of defense DNA expert Roy by allowing the State to raise her workplace disciplinary history to discredit her testimony about the State's DNA evidence. The State counters that her disciplinary history related to her crime lab work and that the State cross-examined her to expose her testimony to the weight it deserved.

7. Appellant challenges a trial court cross-examination ruling finding hearsay in a defense question of Victim about what she told her mother about

the incident. The State points out that this was another effort to elicit testimony that the mother pressured Victim to accuse Appellant.

8. Appellant challenges the trial court's not allowing questions of Victim about what she told her father and brother. The State argues that these questions lacked relevance and might have been for the sake of insinuating that Victim's father or brother molested her.

9. Appellant challenges the trial court's not allowing the defense to ask Appellant whether the mother coached Victim. The State argues this was speculative; nonetheless, Appellant's counsel mentioned it in closing argument.

10. Appellant argues that the trial court erred by not allowing questions of Acevedo whether she sought from Victim alternate reasons why Victim accused Appellant. The State counters that, first, Acevedo answered the question by saying "no" and, second, this was a line of questioning intended to elicit speculative answers.

11. Appellant argues that the trial court erred by neither allowing the defense to ask whether Victim was under the influence of drugs at the time of the incident nor allowing the defense to inquire into Victim's psychological state after the alleged crime. The State counters that the trial court properly deemed these questions as not relevant.

*E. The Rule 3.850 motion*

On June 18, 2024, Appellant filed a rule 3.850 postconviction motion, asking the trial court to vacate certain counts of the judgment of conviction on double jeopardy grounds. The trial court orally denied the rule 3.850 motion on July 30, 2024. Appellant filed his notice of appeal on August 1, 2024, and on August 15, 2024, this Court relinquished jurisdiction to the trial court to enter a written order on Appellant's rule 3.850 motion. On October 21, 2024, the trial court entered the challenged order summarily denying Appellant's rule 3.850 motion.

**II. Analysis**

In addition to his challenges to the Procedural Rulings described above, Appellant argues: (i) the trial court abused its discretion by admitting the State's DNA evidence; and (ii) the trial court erred by denying Appellant's rule 3.850 motion to vacate certain counts of the judgment of conviction based on double jeopardy.[3]

---

[3] Appellant also maintains an additional basis for appeal: that the recent United States Supreme Court opinion in the Confrontation Clause case of Smith v. Arizona, 602 U.S. 779 (2024) compels reversal of his conviction. The Smith opinion was released on June 21, 2024, after both (i) the rendition of Appellant's conviction and sentence, and (ii) the filing of Appellant's rule 3.850 motion. We decline Appellant's invitation to adjudicate his arguments related to Smith in the first instance, and express no opinion on those arguments. Our opinion is without prejudice to Appellant timely raising those arguments in an appropriate postconviction motion.

Upon our review of the record of this case, including the <u>Daubert</u> hearing and trial transcripts, we conclude without further elaboration that the trial court did not abuse its discretion in making the challenged Procedural Rulings. <u>McDuffie v. State</u>, 970 So. 2d 312, 324 (Fla. 2007) (holding that a trial court's limitation on the examination of a witness is reviewed for an abuse of discretion); <u>Fennie v. State</u>, 648 So. 2d 95, 97 (Fla. 1994) (holding that a trial court does not abuse its discretion by denying a motion for continuance unless the ruling will result in prejudice to the defendant); <u>see</u> <u>Pulles v. Onorato</u>, 399 So. 3d 1200, 1202-03 (Fla. 3d DCA 2024) (Gooden, J., specially concurring). We write to address only the DNA testing issues and the trial court's ruling on Appellant's rule 3.850 motion.

*A. DNA Evidence (3D24-1040)* [4]

The crux of Appellant's argument is that Alvarez's DNA analysis methodology was unreliable. Appellant challenges this methodology in the context of a larger argument that the Miami-Dade Police Department crime lab's testing methods are outdated. Appellant's arguments, however, go to the weight rather than to the admissibility of Alvarez's testimony. <u>See</u> <u>Forbes</u>

---

[4] We review a trial court's ruling on the admissibility of DNA evidence for an abuse of discretion. <u>Zieler v. State</u>, 51 Fla. L. Weekly S94, 2026 WL 1026473, at *8 (Fla. Apr. 16, 2026).

v. State, 410 So. 3d 574, 581 (Fla. 4th DCA 2025) ("Any concerns about the probative value of the DNA evidence goes to the weight of the evidence and not its admissibility."); Vitiello v. State, 281 So. 3d 554, 563-64 (Fla. 5th DCA 2019).

Alvarez gave ample testimony about her DNA testing procedures. Her identification of Appellant's DNA from sample mixture was not repudiated by the defense's case. Alvarez testified that her use of this manual method was consistent with her crime lab's standard procedures. She testified that these procedures are not outdated, still in use in laboratories around the country, and generally accepted by the scientific community, and therefore, the Miami-Dade Police Department's crime lab remained accredited. She also testified that her work and conclusions were peer-reviewed before their finality. While perhaps the latest genotyping software might be a better tool for interpreting mixed samples of more than one DNA contributor, and this issue was ripe for cross-examination by Appellant, the trial court was well within its discretion to determine at the Daubert hearing that Alvarez's methodology remained reliable and that Alvarez's expert testimony was admissible at trial.

The State met the Daubert criteria for reliability. See United States v. Gissantaner, 990 F.3d 457, 463 (6th Cir. 2021) ("Four inquiries guide the

reliability analysis: Is the technique testable? Has it been subject to peer review? What is the error rate and are there standards for lowering it? Is the technique generally accepted in the relevant scientific community?"); Kemp v. State, 280 So. 3d 81, 89 (Fla. 4th DCA 2019); § 90.702, Fla. Stat. (2024). We conclude that the trial court did not abuse its discretion in admitting the State's DNA evidence.[5]

*B. Rule 3.850 Motion (3D24-1368)[6]*

*A*ppellant argues that the trial court erred in denying his postconviction motion alleging his convictions constituted a double jeopardy violation. Specifically, Appellant argues: (i) the State sought to convict Appellant on the same offense multiple times because counts 2, 3 and 4 all represent the same statutory offense of lewd and lascivious molestation; and (ii) count 5 is a lesser included offense (rather than a distinct act) of counts 2, 3 and 4.

We agree with the State's argument that double jeopardy does not apply to the State's charges because each offense charged was a distinct

---

[5] We also conclude that the trial court did not abuse its discretion in allowing the State to refer to its serology test as a "presumptive saliva test" to describe Alvarez's search for the alpha amylase enzyme within the DNA samples. Once explained that the test is merely a preliminary step to the DNA testing, the name of the test was unlikely to mislead the jury or prejudice Appellant.

[6] We review *de novo* the summary denial of a rule 3.850 postconviction relief motion. Simeon v. State, 273 So. 3d 157, 158 n.3 (Fla. 3d DCA 2019).

criminal sexual act. <u>Graham v. State</u>, 207 So. 3d 135, 137 (Fla. 2016). The State charged Appellant with committing three separate offenses of lewd and lascivious molestation under section 800.04(5)(C)2. – one count each for touching Victim's breasts, buttocks and vagina. "[A] new act began each time one touch ended and another was initiated, no matter how closely each one followed the other." <u>Id.</u> at 141; <u>see</u> <u>Trappman v. State</u>, 384 So. 3d 742, 754 (Fla. 2024) ("Acts are distinct when they result from 'successive impulses' even when the character of the acts is the same.").[7] Accordingly, we affirm the trial court's denial of Appellant's rule 3.850 motion because Appellant was not subjected to double jeopardy in the State's charges.

### III. Conclusion

We affirm the jury verdict convicting Appellant of criminal sexual activity on a minor in violation of the applicable Florida statutes. We also affirm the trial court's denial of Appellant's postconviction motion based on the ground of double jeopardy.

Affirmed.

---

[7] Below, Appellant raised an additional double jeopardy issue pertaining to count 5, the charge of lewd and lascivious conduct under section 800.04(6)(b), maintaining it was a lesser included offense of the charges underlying counts 2-4. Again, the State argued, count 5 constituted a distinct offense. In his appellate briefing, Appellant did not pursue this argument.